MICHAEL GEORGE PHILLIPS, and JAMES
FREDRICK SLAGLE, Plaintiffs in Error, v. STATE
OF TENNESSEE, Defendant in Error.

455 S.W.2d 637.

Court of Criminal Appeals of Tennessee. Feb. 18, 1970.

Certiorari Denied by Supreme Court June 1, 1970.

610

Edward M. Turner, Clint Beasley, Carthage, for plaintiffs in error.

David M. Pack, Atty. Gen., M. Arnold Peebles, Jr., Asst. Atty. Gen., Nashville, Baxter Key, Dist. Atty. Gen., John Knowles, Asst. Dist. Atty. Gen., Carthage, Larry Turner, Proctor Upchurch, Crossville, for defendant in error.

## OPINION

HYDER, Judge.

Michael George Phillips and James Fredrick Slagle were each convicted of murder in the first degree, robbery by the use of a deadly weapon, kidnapping with intent to extort, and assault with intent to commit murder in the first degree. Each of the defendants received three ninety nine year sentences and one sentence of three years to twenty one years in the penitentiary, to run consecutively. When the trial court overruled their motion for a new trial they prayed and were granted an

appeal in the nature of a writ of error, and thus the cases are before us for review. The defendants are represented by court appointed counsel.

The defendants were charged in four separate indictments and the four indictments were tried together at the request of the defendants, which request was not opposed by the State.

Four assignments of error have been filed with this Court, the first of which contends that the defendants should be granted a new trial because the evidence preponderates in favor of the innocence of the defendants and against their guilt, and there is no evidence to support the jury's verdict. We feel that a brief review of the facts proven is necessary. The testimony in the case consists of a number of witnesses for the State, and the testimony of the defendant Slagle.

This brutal, cruel, macabre series of crimes was committed on June 24, 1968, in Cumberland County, Tennessee. The trial was held in Smith County, Tennessee, after the trial judge sustained defendants' motion for a change of venue.

The two defendants, parolees from Indiana who had known each other previously, having met in a reformatory, met in London, Kentucky, on June 21, 1968, and went into Indiana driving in a Ford car which belonged to Mr. Phillips. In need of money they broke into a country club in Muncie, Indiana, from which they took, in addition to money, two shot guns, a rifle, a .22 caliber target pistol and a .32 caliber automatic pistol. They drove around Indiana, through Kentucky and into Tennessee as they headed south on Highway 127. In or near

Jamestown, Tennessee, they sold the two shot guns for thirteen dollars each, and they purchased beer. Mr. Slagle testified that they had been drinking continuously since they met. During the afternoon of June 24, 1968, they turned their car off of Highway 127 onto a country road for the purpose of urinating. While standing by their automobile a brown Dodge car approached being driven by John Bradley, a twenty year old farmer in that area. He got out and questioned them about what they were doing and they pulled pistols on him. Slagle testified that he put Mr. Bradley in the back seat of the Dodge, a two door car, and told him to lie down, and the defendant Phillips drove the car off. Slagle drove the Ford down the country road in front of the Dodge. An apparent scuffle in the Dodge caused it to run into a ditch by the road and as Slagle was watching the trouble in the Dodge, he also ran over into a ditch. Bradley jumped out of the Dodge car and ran into a nearby farm house owned by Garland Blaylock. Mr. and Mrs. Blaylock were not at home at the time, and they had left their eleven year old daughter Bonnie in charge of her three brothers: Randy, age ten; Frankie, age seven; and Tommy, thirteen months old. Mr. Bradley, whom they knew, took the children into the back bedroom and tried to lock the door. He also put a bed up against the door. Randy and Frankie hid under the bed and Bonnie Blaylock held her infant brother and tried to hide in the clothes closet. Defendants came to the door of the bedroom, tried to get inside, fired two shots through the door, one of which struck Randy in the leg, and called out to be let in. They beat upon the door, apparently with pistols. The defendant Phillips went outside and around to the window in the bedroom and broke it out and they again called out

to be admitted to the bedroom. Either John Bradley let them in or they forced themselves inside, but they did come in the room, according to the testimony of all of the Blaylock children. The children said that Mr. Bradley pleaded with them to not kill him, to leave him alone, that they had already taken his car and that they should go on and leave him alone. The children all said that John Bradley got down on his knees and begged for his life, and they told him to stand up, and they shot him several times, killing him instantly. They said that one of the defendants said that he wasn't dead, to shoot him again, and they shot him again. They tore the telephone wires loose and threw it in the floor and went outside to the cars. They both got in the Dodge and went up to where the Ford was in the ditch. By this time five boys working on a hay truck approached the defendant Slagle as he was trying to get the Ford car out of the ditch. The defendant Phillips was some distance away in the Dodge car belonging to John Bradley. Slagle told them that the reverse on the car was not working, which was true, and asked them to help push it out. They did this and he gave them four cans of beer out of the car. There was a guitar in the car and one of the boys asked to play it, and Slagle gave him the guitar, for helping get his car out of the ditch. The two cars drove off a short distance and Slagle got out of the Ford and into the Dodge and they drove away together. They became confused driving on country roads, and they could not find their way back to Highway 127. As they drove down a gravel road they met Mrs. Josephine Davis, walking along the road on her way to milk her cow. They stopped and forced her at pistol point to get in the back seat of the Dodge. She said that they threw her into the car. She cried and begged

them to let her go home, telling them that she had five boys at home, and Phillips said: "That don't bother me a bit. I have three little girls, and that don't bother me a bit." She said that they told her: "Lady, you can't ever go home. We are going to kill you." They demanded that she show them the way back to Highway 127. While trying to get her to shut up, she said, Phillips said: "Look lady, do you see my hand? That is not my blood. We just killed a man, and one more won't make any difference." He also asked her if she had ever been raped and told her that he might do just that. She said that Slagle took her watch off of her arm, that "he stole it." She testified that they held her at pistol point the entire time. A short time later, as they drove down the country road, a police car came up behind them. The Chief of Police of Crossville, and other officers, in answer to a radio call, had gone into the area looking for a brown Plymouth with two men in it. They turned on their siren and the Dodge stopped beside the road. When the Chief approached the Dodge he was faced by the defendants, armed, who not only threatened him but threatened to kill their hostage, Mrs. Davis. The Chief retreated to his cruiser and within a short time the Sheriff arrived. The defendants were arrested without doing further harm, but before Phillips was placed under arrest the Sheriff shot him two times. Phillips tried to run away from the scene, and, after firing a warning shot the Sheriff shot him in the leg. Phillips then told the Sheriff that he was going to kill him, and the Sheriff shot him a second time before he was able to subdue him.

The defendant Slagle took the witness stand in his own behalf. On direct examination he testified that he had

been involved with the authorities since he was twelve years old at which time he committed a burglary. He testified that he was an alcoholic, that he drank excessively whenever he started drinking, that he never got into trouble when he was not drinking, and that he would at times get so drunk that he would not know what he was doing and would not remember. He attempted, in his testimony, to prove that he was under that degree of intoxication when these events happened. He stated that throughout the events he had the .22 caliber pistol and Phillips had the .32. He detailed to the court and jury his going into the Blaylock home, and he said that when the door to the bedroom was opened he saw John Bradley, or at least a part of his body, and he saw his arm make a move, which he thought might be to harm him, and he fired instantly about six times. He denied that he had shot through the door, and he denied going into the bedroom. He shot Bradley from the hall, he said, through the open door. He denied taking John Bradley's billfold and said that he did not have it in his back pocket where the officers say they found it. He said that they took Mrs. Davis to try to find a way out of the state.

The four indictments resulted from the taking of the car and money of John Bradley, by force or violence, from his person, by the use of the pistols; from the cruel slaying of John Bradley; from the shooting of Randy Blaylock while attempting to break into the bedroom; and from the kidnapping of Mrs. Davis and attempt to extort information from her. The jury, after a trial of four days, found them guilty under each indictment and fixed the punishment we have stated.

The brief filed on behalf of the defendants contends that there was a terrible crime committed and that they played a major part in this tragic event; however, they insist that there was no evidence to substantiate a verdict of guilty of murder in the first degree because the State failed to prove malice and premeditation. There is no merit to this argument. We think that malice and premeditation were both proven; but in any event, the slaying was in the commission of a robbery. TCA § 39-2402. The brief contends, and the defendant Slagle testified, that they did not intend to take the car of John Bradley, and that they did not intend to harm him. Certainly the evidence does not support this contention.

The brief contends that the shooting of young Blaylock does not reveal any premeditation, but on the contrary all of the proof shows this shooting was an accident. We do not agree. To sustain a conviction of assault with intent to commit murder in the first degree, it must appear that the assault was of such a character, and made under such circumstances, that, had death ensued, the defendant would have been guilty of murder in the first degree. Dains v. State, 21 Tenn. 439. Randy Blaylock was shot while the defendants were attempting to break down the door to the bedroom for the purpose of murdering John Bradley. Certainly if Randy Blaylock had been killed by the shot it would have been murder in the first degree. TCA §§ 39-2402, 39-902, 39-903.

It is further contended in the brief that the acts of the defendants in taking Mrs. Davis were not acts of kidnapping, but actually the acts of terrified and frightened men who were attempting to be shown the way of escape in their drunken and confused state of mind. It is

certain that the defendants were not familiar with the roads and they did not know how to get back to Highway 127. The proof does not support their contention that they were drunk. A reading of the record and especially the testimony of Mrs. Davis erases any doubt which any reasonable mind might entertain as to their guilt of kidnapping.

It is well established by numerous decisions of the Supreme Court of Tennessee, and of this Court, that a verdict of guilty, approved by the trial judge, accredits the testimony of the State's witnesses, resolves all conflicts in the testimony in favor of the State, and establishes the State's theory of the case. Under such a verdict the presumption of innocence disappears, and upon appeal, that presumption of innocence is replaced by a presumption of guilt. This Court is not permitted to reverse a conviction upon the facts unless the evidence clearly preponderates against the verdict of the jury and in favor of the innocence of the accused. We may review the evidence only to determine whether it preponderates against the verdict, and the defendant on appeal has the burden of showing that the evidence preponderates against the verdict and in favor of his innocence. McBee v. State, 213 Tenn. 15, 372 S.W.2d 173; Gulley v. State, 219 Tenn. 114, 407 S.W.2d 186; Brown v. State, Tenn. Cr. App., 441 S.W.2d 485.

The defendant James Fredrick Slagle, in his testimony, and there was no other testimony offered by the defendants, contended that he was drunk and did not know what he was doing, and he also attempted to show that his shooting of John Bradley, which he readily admitted, was in his own self defense. We believe that he

failed completely to establish either theory. Further, all of the witnesses for the State who testified on the subject, and most of them did, said that he was sober, not drunk and not under the influence of intoxicants. The children, who witnessed the killing of Mr. Bradley, detailed the events clearly. A more cold blooded, brutal slaying can not be imagined.

The trial judge and the jury see the witnesses face to face, hear their testimony on the witness stand and observe their demeanor. They are in a much better position than are we to determine the weight and credibility to be given to the testimony of witnesses. Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523. Our Supreme Court has expressed this principle in the following words:

"Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court." Bolin v. State, 219 Tenn. 4, 405 S.W.2d 768.

In an often cited opinion on the sufficiency of the evidence to support a verdict of guilty, the Supreme Court said:

"Considering the assignment thus framed, we will proceed to examine the facts. In doing this, we will go into no detailed statement or argument as to the credibility of witnesses, slight discrepancies, and conflicts in testimony; all of these questions having been settled by the verdict of the jury. It must appear to all that, under the rules we have stated, no case can be reversed

on the facts where an elaborate argument of the evidence is necessary to affect that end. They (sic) very necessity for such a thing rebuts the idea that the verdict is against the clear preponderance of the evidence; nor, as a rule, is it properly the providence of the court to make an argument, but, on the contrary, after full and exhaustive consideration, to state its conclusion, upon both the facts and the law." Cooper v. State, 123 Tenn. 37, at 60, 138 S.W. 826.

The defendants have not shown that the evidence preponderates against the verdict and in favor of their innocence. Certainly there is ample evidence in this record to sustain all of the convictions. We overrule the first assignment of error.

The second assignment of error contends that the trial court committed reversible error in allowing the State to question the prospectice jurors as to whether or not they believed in capital punishment and if the facts warranted whether or not the juror would return a verdict for capital punishment.

The entire voir dire of all of the jurors is a part of the bill of exceptions. During this proceeding the State exercised two peremptory challenges, the defendants exercised a total of nine peremptory challenges, and the trial court allowed several jurors to be excused because they stated that they did not believe in capital punishment and they would not consider imposing it if they found guilt.

The District Attorney General did not word his questions the same to every juror, but in each instance he would ask the prospective juror if the facts justified it if he would impose capital punishment, or if he would con-

sider imposing the death sentence. If the juror replied that he would not consider imposing the death sentence, the trial judge allowed him to be excused. The first juror questioned was so excused, and the following dialogue between the prospective juror and General Key appears:

> "The juror, Mr. E. L. Bunch: 'I said the death penalty, I didn't believe in it.'

> "General Key: 'Then Mr. Bunch, if I understand you correctly, you wouldn't consider that no matter what the facts were in the case?'

> "Mr. Bunch: 'No, sir.' "

The judge allowed him to be challenged for cause, and the counsel for the defendants excepted and saved their exceptions.

The defendants cite Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), as authority supporting their theory that the trial judge erred in allowing the State to challenge this juror and others like him for cause. We do not find that this decision of the United States Supreme Court denies the State's right to exclude from the jury in capital cases those who say that they could never impose the death penalty or that they would refuse even to consider its imposition in the case before them. The trial judge did not commit error by allowing the prospective jurors to be challenged for cause.

Furthermore, *Witherspoon* applies only when the death sentence is imposed. Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797. The meaning of *Witherspoon* is explained in Boulden v. Hol-

man, 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433, (1969). We overrule this assignment of error.

 The third assignment of error contends that it was error to allow the State to use Dillard Garrison as a witness. It is alleged that the name of this witness was not on the indictment and was not presented to the defendants prior to his testimony, thereby taking the defendants by surprise, inasmuch as they did not know the nature of his testimony prior to his testifying.

Dillard Garrison was the X-ray technician in the hospital in Crossville. Under the supervision of, and in the presence of Dr. James Callis, the Medical Examiner, he made some X-ray photographs of the body of John Bradley. He developed the film and turned the pictures over to Dr. Callis. This was the extent of his testimony. Dr. Callis used the pictures to point out that shell fragments were shown in the body. There was no objection to the testimony of Dr. Callis except when the X-rays were offered. Counsel then objected unless Dr. Callis was present when the X-rays were made or they were made under his supervision. When Dr. Callis testified that he was present when they were made and that they were made under his supervision, no further objection was posted.

It was not error for the trial judge to allow the X-ray technician to testify. Our Supreme Court has held that T.C.A. § 40-2407, which directs the district attorney to endorse on the indictment, at the term the same is found, the names of such witnesses as he intends shall be summoned does not mean the State is limited to those witnesses whose names appear on the indictment. Douglass

v. State, 213 Tenn. 643, 378 S.W.2d 749. The testimony did not prejudice the defendants in any way. McBee v. State, supra. It was pointed out that a subpoena issued for the witness in July and returned October 1, 1968, the day the trial began. We overrule the assignment of error.

The fourth assignment of error concerns only the defendant Slagle, and is as follows:

"That the Court erred in failing to dismiss the charges, inasmuch as the defendant, James Fredrick Slagle, had requested and demanded an Attorney on June 24, 1968, at the time of his arrest and was not furnished an Attorney until July 9, 1968."

It is contended in the brief that the constitutional rights of the defendant Slagle were violated in not providing him with an attorney during this period of time.

When the defendant Slagle was taken to the county jail he was given the right to make a telephone call. He called his mother, in Indiana, and he talked to her. Officer Robert Foutch, of the Tennessee Highway Patrol, was with the defendant when he made the call, and he talked to Slagle's mother after the defendant had talked to her. During his direct testimony Mr. Slagle stated that he talked to his mother. He was asked on cross examination if he did not tell his mother that he was not drunk this time, that they only had a couple of beers, and that if she would come after him he would never get in trouble again. He denied that he had said that. Then, in rebuttal, the State put Officer Foutch back on the witness stand. He testified that Mr. Slagle did say to the woman he had called: "Mother, I'm in bad trouble this

time. This time, I am not drunk; only had a couple of beers, and we got a six pak, I believe to go. You can see I am not drinking. Mother, if you will come and help get me out of this, I will never get into anything else. We got into bad trouble. When the trouble started, bullets went wild." It is contended that it was error to allow this testimony in the record since Mr. Slagle did not have an attorney present and he had not been advised that any statement he made could be used against him.

The testimony of Officer Foutch was not objected to at the time it was presented. The motion for a new trial does assign as error the alleged failure to provide an attorney for the defendant James Fredrick Slagle for a period of two weeks, but the testimony of Officer Foutch concerning what he told his mother on the telephone is not complained of in the motion for a new trial.

Objections to evidence must be timely made or they are waived and cannot be raised for the first time on appeal. Harless v. State, 189 Tenn. 419, 225 S.W.2d 258; Floyd v. State, Tenn. Cr. App., 430 S.W.2d 888.

The statement overheard and related by the officer was not the result of "custodial interrogation," and, hence, it was outside the proscriptive dictate of the United States Supreme Court in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

Nothing appears in this record to indicate that the holding of the defendant allegedly without an attorney prejudiced him in any way. He was questioned but said that he did not wish to make a statement and that concluded the interrogation. No statements attributable

to the defendant were taken and none were introduced against him except that which we have previously discussed. His Constitutional rights were not violated. Van Zandt v. State, 218 Tenn. 187, 402 S.W.2d 130; Bolin v. State, supra.

This assignment of error is simply an unsupported conclusory allegation. The Federal Courts have held that when a motion is made to vacate or set aside a judgment the movant must set forth facts which entitle him to relief. Conclusions, not substantiated by allegations of fact with some probability of verity, are not sufficient. O'Malley v. United States, 285 F.2d 733 (C.A. 6). This assignment of error is overruled.

We have read and studied the record of this case in great detail. We are of the opinion that the defendants received a fair and legal trial in every respect. They moved for a change of venue; that they be given mental examinations to determine their competency to be tried; and that they be tried on all four indictments in one trial or proceeding. All of these motions were sustained. In our search of this record for error, as we are required to do, we find none, and we are of the opinion that the judgments should be affirmed.

We express our genuine appreciation to counsel, who, by appointment of the trial judge, have capably and effectively represented the defendants.

The judgments are affirmed.

RUSSELL and GALBREATH, JJ., concur.